01

02

03

04

05

06

07                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF WASHINGTON
08                            AT SEATTLE

09  JOSH LAWSON and CHRISTOPHER      )
    FRANKLIN,                        )    CASE NO. C12-1994-MAT
10                                   )
            Plaintiffs,              )
11                                   )
            v.                       )    ORDER RE:   MOTIONS FOR
12                                   )    SUMMARY JUDGMENT
    CITY OF SEATTLE, et al.,         )
13                                   )
            Defendants.              )
14  _____)

15                            INTRODUCTION

16          Plaintiffs Josh Lawson and Christopher Franklin bring this action against the City of

17  Seattle, Seattle Police Officer Bradley Richardson, and Seattle Police Officers 1-4, alleging

18  violations of their federal constitutional rights under 42 U.S.C. § 1983 and violations of state

19  law.  (Dkt. 1.)  Plaintiffs' constitutional claims include unreasonable force and seizure in

20  violation of the Fourth Amendment, and liability of the City of Seattle through policies,

21  practices, and/or customs causing the constitutional violations.  Plaintiffs' state law claims

22  include negligence, intentional and negligent infliction of emotional distress, assault and

01   battery, false arrest, and false imprisonment.

02        Defendants City of Seattle and Richardson now move for summary judgment (Dkt. 19)

03   and partial summary judgment (Dkt. 21) respectively.   Plaintiffs oppose the motions.   (Dkts.

04   39 and 40.)   Having considered the motions, oppositions, and all materials filed in support, as

05   well as the remainder of the record, the Court GRANTS in part and DENIES in part the pending

06   motions for the reasons set forth below.[1]

07                                                          BACKGROUND

08        On November 16, 2010, Anthony Fantozzi was assaulted as he walked through an alley

09   on his way to a bar, "The Funhouse," located in downtown Seattle.   (Dkt. 24 at 1.)   Fantozzi

10   felt something hard and blunt hit the back of his head, was punched in the face, and fell to the

11   ground.   (*Id*. at 1-2.)   He saw two black males standing over him, jumped up, and ran to The

12   Funhouse, with his face covered in blood.   (*Id*. at 2.)   Fantozzi pointed out the two men who

13   had assaulted him to Joanna Crinnion, a fellow employee.   (*Id*.)

14        Crinnion called 911 to report the assault, with Fantozzi providing information in the

15   background.   (*Id*.)   In the call, Fantozzi and Crinnion reported Fantozzi had been assaulted by

16   two tall, skinny, African-American males in their mid-to-late twenties, both wearing jeans and

17   one wearing a black or dark "hoodie" sweatshirt, and the individuals were last seen turning left

18   (East) on Denny Way.   (Dkt. 23, Ex. A (911 call) and Ex. B (computer-aided dispatch (CAD)

19   report).)

20   _____

21        1 The Court also herein *sua sponte* grants judgment in favor of "Seattle Police Officers 1-4."
     Discovery in this matter has been complete since February 2014 and the trial is set to commence within
     a matter of weeks.   Plaintiffs have had ample opportunity to identify and name these individuals.   *See*

22   *Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980).   Because they remain unnamed and unserved at
     this late date, plaintiffs' claims against these John Doe defendants are appropriately DISMISSED.

ORDER RE: MOTIONS FOR
SUMMARY JUDGMENT
PAGE -2

01      The parties present differing versions of the events occurring on the night of Fantozzi's

02  assault.   Plaintiffs Lawson and Franklin explain they came to downtown Seattle to celebrate

03  their acceptance into a training program.   Lawson, who was wearing white sweat pants and a

04  black t-shirt, and Franklin, who was wearing jeans and a dark hoodie, began to walk around and

05  decided to visit a bar near the Seattle Center.   (Dkt. 42 at 1; Dkt. 44 at 1-2.)   As they walked,

06  they observed a police car, "trotted" across a street to avoid a different car, and proceeded down

07  an alley on their way to the bar.   (Dkt. 42 at 2; Dkt. 44 at 2; Dkt. 22, Ex. A at 42 and Ex. B at 8.)

08      Defendant Richardson, who was working patrol, heard the dispatch as to the 911 call

09  and was within a couple of minutes of the area of the call.   (Dkt. 25 at 2.)   In checking the

10  area, Richardson observed a thin black male in his late teens, wearing a black t-shirt and white

11  sport/sweat pants, and perceived that individual as both acting as though he was trying not to be

12  seen and watching Richardson.   (*Id.*)   He does not recall seeing anyone else in the area.   (*Id.*

13  at 3.)   Richardson then observed the same black male quickly cross Sixth Avenue North to the

14  west side, where he joined another black male, who was wearing jeans and a dark hoodie, and

15  both men began running west and then south through an alley.   (*Id.*)

16      Richardson advised dispatch he had two suspects running in the alley behind the Best

17  Western Hotel.   (Dkt. 23, Ex. B at 5; Dkt. 25 at 4; Dkt. 33-1 at 2.)   As he approached the alley

18  entrance, he observed the same two males walking briskly through the alley, advised radio as to

19  his location, and exited his patrol car.   (Dkt. 25 at 4.)   Richardson maintains the individual

20  wearing the hoodie had his hands in his hoodie pockets, that he advised "Stop, Police!", and that

21  both men continued to walk towards him.   (*Id.*)   He advised, "Stop, Police, show me your

22  hands and get on the ground!", but the men continued to close the distance.   (*Id.*)   Richardson

ORDER RE: MOTIONS FOR
SUMMARY JUDGMENT
PAGE -3

01   drew his weapon, stepped towards the men, and yelled, "Get on the ground!", with his weapon

02   "at the low ready," meaning pointed at the ground, but out and available.  (*Id.*)   At that point,

03   both men stopped, some five to six feet away, and "began to comply."  (*Id.* at 5.)

Lawson (wearing the sweat pants and t-shirt) and Franklin (wearing the jeans and

05   hoodie) attest that, as they were walking down the alley, they saw a police officer (Richardson)

06   behind his car door, with his gun drawn and pointing at them, and yelling – only once – "Get on

07   the ground!"  (Dkt. 42 at 3; Dkt. 44 at 2.)   Lawson and Franklin quickly got down, with

08   Lawson's knees and hands on the ground, and Franklin's knees on the ground and hands behind

09   his head, whereupon Richardson raised his boot and kicked Lawson on the right side of his

10   face/jaw.  (*Id.*)   A police officer put knees on Lawson's chest/throat, two other officers put

11   knees on his stomach, his face was pushed onto the ground, and his arms were handcuffed

12   behind his back.  (Dkt. 44 at 2.)   Officers pushed Franklin's face onto the ground and put his

13   hands in handcuffs behind his back.  (Dkt. 42 at 3.)

Richardson contends that, while Franklin began to lay flat on the ground, Lawson

15   slowly crouched down in a squat, and stayed that way despite being advised to lay flat.  (Dkt.

16   25 at 5.)   Although Seattle Police Officer John Schweiger had by then arrived on the scene,

17   Richardson did not yet know of Schweiger's presence, feared Lawson would lunge at him from

18   the squatting position, and used a flat foot, front push kick to Lawson's chest, knocking him

19   backwards.  (*Id.*)   Richardson and Schweiger thereafter rolled Lawson onto his stomach.  (*Id.*

20   at 5-6.)   Richardson did not assist with handcuffing Franklin.  (*Id.*)

Schweiger, as he was driving to the scene, observed Richardson pull into the alley, exit

22   his car, position himself behind the opened door, and give verbal commands of some kind to

ORDER RE: MOTIONS FOR
SUMMARY JUDGMENT
PAGE -4

01 Lawson and Franklin.   (Dkt. 33-1 at 2.)   Schweiger attests he saw Lawson and Franklin come

02 within eight feet of Richardson, and Richardson emerge from his position of cover with his

03 handgun drawn in the low-ready position and order the suspects to the ground.   (*Id.*)   Franklin

04 went to the ground belly down, Lawson went into and remained in a crouching position, and

05 Richardson knocked Lawson over with a front push kick to the chest.   (*Id.* at 3.)   Schweiger

06 took control of Lawson's right foot/leg and, with Richardson's assistance, rolled Lawson over

07 and under control.   (*Id.*)

08 　　　Some ten minutes or more after officers handcuffed Lawson and Franklin, Seattle

09 Police Officer Brit Kelly (née Sweeney) brought Fantozzi and Crinnion to the scene for a

10 "show-up."   (Dkt. 25 at 6.)   In a declaration provided to defendants, Fantozzi attests he told a

11 female police officer (Kelly) "'those were the guys[]'" and then that he "'was pretty sure those

12 were the guys'" but he could not be "100% sure[,]" and that Kelly told him "she was going to

13 take that as a positive identification."   (Dkt. 24 at 3.)   In a subsequent declaration provided to

14 plaintiffs, Fantozzi attests he is "certain" he was "trying to tell the police [he] was not 100%

15 sure" they were the men who had assaulted him, and that he "was not willing to make a positive

16 identification of [the] men[]" in his written statement.   (Dkt. 50.)[2]

17 　　　Richardson did not hear Fantozzi make the identification.   (Dkt. 25 at 6.)   He attests

18 Kelly communicated to him a positive identification had been made and he proceeded to read

19 Lawson and Franklin their Miranda rights.   (*Id.*)   Following the arrest, Lawson and Franklin

20

---

21 　　　2 Fantozzi attested in his first declaration he wrote his statement regarding the assault (*see* Dkt.
24, Ex. B) before he went to the show-up.   (Dkt. 24 at 3.)   In his subsequent declaration, Fantozzi
22 states that, while he is not certain when he started writing the statement, he "did not finish writing it until
after" he was taken to see Lawson and Franklin.   (Dkt. 50 at 1-2.)

ORDER RE: MOTIONS FOR
SUMMARY JUDGMENT
PAGE -5

01    were placed in patrol cars and transported to the West precinct.   (*Id.*)

02         In addition to the above incidents, Lawson and Franklin point to various statements

03    made by Richardson, some of which can be overheard on police in-car video recordings.[3]

04    They assert, for example, that Richardson and other officers made fun of Lawson's middle

05    name (Precious), stating:   "'Did that hurt Precious,' 'Oh, are you ok Precious,' and 'Did your

06    mommy name you Precious[?]'"   (Dkt. 42 at 3; Dkt. 44 at 3.)   Franklin points to comments by

07    Richardson that Franklin was "going to jail for robbery[,]" and Richardson was "going to make

08    stuff up[,] . . . [m]aybe jaywalking."   (Dkt. 42 at 5.)   He also points to various other

09    comments, such as Richardson calling him a "fucking prick[,]" making comments about his

10    hairstyle, and the following:   "Credit cards in his own name, [damn], he has his own credit

11    cards in his own name, [damn] it, that always sucks when I see that[,]" "I always hate it when

12    that happens.   I was going to shoot one of them too."   (*Id.*)

13         Richardson, in response, notes "a lot of back and forth" between officers and plaintiffs

14    as captured on in-car video, and describes his tone in making the comments about robbery and

15    jaywalking as sarcastic.   (Dkt. 25 at 6-7.)   Richardson also notes Franklin's admission in his

16    deposition that he did not hear the credit card-related comments at the time, and only later

17    reviewed them on video.   (*Id*. at 7 and Dkt. 22 at 4:24-6:5.)

18         Lawson and Franklin were released in the early morning of November 17, 2010, and,

19    upon returning to Seattle Municipal Court for arraignment, were told they were not being

20    charged with anything.   (Dkt. 42 at 6; Dkt. 44 at 4-5.)   Both maintain ongoing nightmares and

21    suffering in relation to the events surrounding the stop, arrest, and their detention.   (*Id.*)

22
           3 There is no in-car video recording capturing the initial stop.

ORDER RE: MOTIONS FOR
SUMMARY JUDGMENT
PAGE -6

DISCUSSION

A.    Summary Judgment Standard

Summary judgment is appropriate when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof.   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).   The Court must draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).   The moving party bears the initial burden of showing the district court "that there is an absence of evidence to support the nonmoving party's case."   *Celotex Corp.*, 477 U.S. at 325.   The moving party can carry its initial burden by producing affirmative evidence that negates an essential element of the nonmovant's case, or by establishing that the nonmovant lacks the quantum of evidence needed to satisfy its burden of persuasion at trial.   *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).   The burden then shifts to the nonmoving party to establish a genuine issue of material fact.   *Matsushita Elec. Indus. Co.*, 475 U.S. at 585-87.

In supporting a factual position, a party must "cit[e] to particular parts of materials in the record . . .; or show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the

ORDER RE: MOTIONS FOR
SUMMARY JUDGMENT
PAGE -7

01  fact." Fed. R. Civ. P. 56(c)(1).   The nonmoving party "must do more than simply show that

02  there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475

03  U.S. at 585.   "[T]he requirement is that there be no *genuine* issue of material fact.  . . . Only

04  disputes over facts that might affect the outcome of the suit under the governing law will

05  properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 247-48 (emphasis

06  in original).   Also, "[t]he mere existence of a scintilla of evidence in support of the

07  non-moving party's position is not sufficient[]" to defeat summary judgment. *Triton Energy*

08  *Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).   Likewise, the nonmoving party

09  "cannot defeat summary judgment with allegations in the complaint, or with unsupported

10  conjecture or conclusory statements." *Hernandez v. Spacelabs Med. Inc*., 343 F.3d 1107,

11  1112 (9th Cir. 2003).

12  B.   <u>Qualified Immunity Analysis</u>

13        Under the doctrine of qualified immunity, state officials "performing discretionary

14  functions [are protected] from liability for civil damages insofar as their conduct does not

15  violate clearly established statutory or constitutional rights of which a reasonable person would

16  have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).   In determining whether

17  qualified immunity applies, the Court considers whether the plaintiff alleged sufficient facts to

18  make out a violation of a constitutional right, and whether the constitutional right was clearly

19  established at the time of the alleged violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001),

20  *modified by Pearson v. Callahan*, 555 U.S. 223 (2009) (explaining "that, while the sequence set

21  forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory").

22        The Court takes the facts in the light most favorable to the party asserting the injury in

ORDER RE: MOTIONS FOR
SUMMARY JUDGMENT
PAGE -8

01  determining whether an official violated a constitutional right. *Acosta v. City of Costa Mesa*,

02  718 F.3d 800, 825 (9th Cir. 2013) (citing *Saucier*, 533 U.S. at 201). In considering whether a

03  right is clearly established, "[t]he contours of the right must be sufficiently clear that a

04  reasonable official would understand that what [the official] is doing violates that right."

05  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The court applies an objective standard;

06  "the defendant's subjective understanding of the constitutionality of his or her conduct is

07  irrelevant." *Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1109 (9th Cir. 2011) (internal

08  quotation marks and quoted source omitted). An official who makes a reasonable mistake as

09  to what the law requires is entitled to immunity. *See Saucier*, 533 U.S. at 295; *Kennedy v. City*

10  *of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006).

11  C.    Richardson's Motion for Partial Summary Judgment

12      Plaintiffs assert Richardson violated their Fourth Amendment rights through

13  unreasonable force and seizure, and assert a number of state law claims. Acknowledging

14  disputes of fact relating to the kick employed on Lawson,[4] Richardson does not move for

15  summary judgment in relation to that use of force. Richardson does, however, seek summary

16  judgment in relation to the other force applied and all other claims brought in this lawsuit, and

17  further asserts his entitlement to qualified immunity.

18      1.    Fourth Amendment:

19      Plaintiffs raise their constitutional challenges under 42 U.S.C. § 1983, which requires a

20  _____

21      4 Lawson alleges that, while he was on his hands and knees on the ground, Richardson kicked
    him in the face, in the area of his jaw, causing him to fly backwards. (Dkt. 40 at 3-4.) Richardson
    contends he perceived Lawson as crouching into a squat from which Lawson could have lunged

22  forward, and that he used a flat foot, front push-kick to the center of Lawson's chest to knock him
    backwards to the ground. (Dkt. 21 at 6, n.4.)

01  showing that (1) they suffered a violation of rights protected by the Constitution or created by

02  federal statute, and (2) that the violation was proximately caused by a person acting under color

03  of state or federal law.  *West v. Atkins*, 487 U.S. 42, 48 (1988); *Crumpton v. Gates*, 947 F.2d

04  1418, 1420 (9th Cir. 1991).   As there is no dispute Richardson acted under color of state law,

05  the Court addresses only the Fourth Amendment violations alleged.  *See* U.S. Const. Amend.

06  IV ("The right of the people to be secure in their persons, houses, papers, and effects, against

07  unreasonable searches and seizures, shall not be violated[.]")   Also, as construed and/or

08  anticipated by defendant, the Court considers plaintiff's Fourth Amendment claims as alleging

09  an absence of reasonable suspicion for Richardson to stop plaintiffs, that the stop was converted

10  into an arrest, that there was an absence of probable cause for the arrest and imprisonment

11  following the show-up at the scene with Fantozzi, and the use of excessive force.[5]

12                    a.    <u>Reasonable suspicion to stop</u>:

13        "'The Fourth Amendment prohibits unreasonable searches and seizures by the

14  Government, and its protections extend to brief investigatory stops of persons or vehicles that

15  fall short of traditional arrest.'"   *United States v. Valdes-Vega*, 685 F.3d 1138, 1143-44 (9th

16  Cir. 2012) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).   *See also Terry v. Ohio*,

17  392 U.S. 1, 9-10 (1968).   To justify a "*Terry* stop," an officer must have reasonable suspicion

18  of an individual's involvement in criminal activity.   *Valdes-Vega*, 685 F.3d at 1144.

19  "'[R]easonable suspicion exists when an officer is aware of specific, articulable facts which,

20  when considered with objective and reasonable inferences, form a basis for particularized

21  ───────────────────

22        5 Plaintiffs do not respond to defendant's contention that the duration of the stop, considered by itself, was reasonable.  (*See* Dkt. 21 at 13-14.)   The Court, therefore, only considers this as a factor relevant to the question of whether the stop was converted into an arrest.

ORDER RE: MOTIONS FOR
SUMMARY JUDGMENT
PAGE -10

01  suspicion.'" *Id*. (quoting *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir.

02  2000) (en banc)) (emphasis removed).   There must be an objective justification for the stop;

03  more than just a "hunch" of criminal activity.   *Id*.

04      The Court looks at the totality of the circumstances in considering the existence of

05  reasonable suspicion, rather than examining various factors in isolation.   *Id*.   "This approach

06  'allows officers to draw on their own experience and specialized training to make inferences

07  from and deductions about the cumulative information available to them that might well elude

08  an untrained person.'"   *Id*. (quoting *Arvizu*, 534 U.S. at 273).

09      In this case, a 911 call reported an assault by two tall, skinny African-American males in

10  their mid-to-late twenties, both wearing jeans and one wearing a black or dark hoodie

11  sweatshirt.  (Dkt. 23, Ex. A.)   At a minimum, and taking the facts in the light most favorable

12  to plaintiffs, it can be said that Richardson, shortly after the 911 call and in the vicinity of the

13  assault, observed two black males together, one of whom was wearing the clothing items

14  identified in the 911 call, and that both individuals saw the police car, "trotted" across a street,

15  and moved in the opposite direction of Richardson.   (*See* Dkts. 22, 25, 42 and 44.)   Plaintiffs

16  also do not dispute Richardson's recollection as to an absence of other people in the area.

17  (Dkt. 25.)[6]   Considering the totality of the circumstances, the Court has no difficulty in

18  concluding Richardson had reasonable suspicion to make a *Terry* stop.

19      Plaintiffs' reliance on case law providing that reasonable suspicion must be based on

20      6 Richardson points to a variety of other factors as forming the basis for his reasonable
suspicion, including, *inter alia*, his perception that Lawson was inappropriately dressed for the weather
21  and acting suspiciously, and his contention that both Lawson and Franklin saw him and, within seconds,
began to run in the opposite direction.  (Dkt. 25.)  Lawson and Franklin concede they saw the police
car, but Lawson states he did not for a moment believe the police car was looking for them, and both
22  maintain they were shocked to see Richardson drawing a gun on them in the alley.   (Dkts. 42 and 44.)

ORDER RE: MOTIONS FOR
SUMMARY JUDGMENT
PAGE -11

01  more than a hunch, nervous behavior, and/or moving away from a law enforcement official

02  ignores the totality of the circumstances, including that Richardson's observations and

03  plaintiffs' actions took place close in time and in the vicinity of the assault, and in the absence

04  of other individuals in the same area.   *Cf. Moreno v. Baca*, 431 F.3d 633, 642 (9th Cir. 2005)

05  ("nervousness in a high crime area, without more, did not create reasonable suspicion to detain

06  an individual" and the "simple act of walking away from the officers could not have been

07  reasonably mistaken" for recognition that "in some circumstances an individual's flight from

08  law enforcement in a high crime area can justify an investigatory seizure.").   In fact, plaintiffs'

09  own expert expressed his agreement as to the existence of reasonable suspicion.   (Dkt. 22, Ex.

10  C at 76:19-77:9, 78:25-80:7.)   The Court, as such, finds defendant entitled to summary

11  judgment on the issue of reasonable suspicion to conduct a *Terry* stop.

12              b.    Conversion of *Terry* stop into arrest:

13          While a *Terry* stop necessitates only reasonable suspicion, an arrest requires the more

14  demanding standard of probable cause.   *Washington v. Lambert*, 98 F.3d 1181, 1185-86 (9th

15  Cir. 1996).   A warrantless arrest without probable cause violates the Fourth Amendment.

16  *Beck v. Ohio*, 379 U.S. 89, 91 (1964).

17          "There is no bright-line rule to determine when an investigatory stop becomes an

18  arrest."   *Lambert*, 98 F.3d at 1185 (citing *United States v. Parr*, 843 F.2d 1228, 1231 (9th Cir.

19  1988)).   The Court employs a fact-specific inquiry, considering the totality of the

20  circumstances.   *Gallegos v. City of Los Angeles*, 308 F.3d 987, 990 (9th Cir. 2002).

21  Considerations include "both the intrusiveness of the stop, i.e., the aggressiveness of the police

22  methods and how much the plaintiff's liberty was restricted, and the justification for the use of

ORDER RE: MOTIONS FOR
SUMMARY JUDGMENT
PAGE -12

01 such tactics, i.e., whether the officer had sufficient basis to fear for his safety to warrant the

02 intrusiveness of the action taken." *Lambert*, 98 F.3d at 1185 (internal citations omitted).  *See*

03 *also United States v. Buffington*, 815 F.2d 1292, 1300 (9th Cir. 1987) ("The use of force during

04 a stop does not convert the stop into an arrest if it occurs under circumstances justifying fears

05 for personal safety.")

06          Pointing a weapon at and handcuffing a suspect, ordering a suspect to lie on the ground,

07 or placing a suspect in a police car suggest, but do not automatically convert an investigatory

08 stop into an arrest.  *Lambert*, 98 F.3d at 1186, 1188-89.  The duration of the detention may

09 also be relevant.  *Id*. at 1189, n.11.  The Court considers whether various factors justify the

10 use of aggressive and intrusive police tactics, such as: (1) whether the suspect is uncooperative

11 or takes action raising a reasonable possibility of danger or flight; (2) whether the officer had

12 information the suspect is "currently armed;" (3) whether the stop closely follows a violent

13 crime; (4) information a crime that may involve violence is about to occur; (5) specificity of the

14 information leading the officers to suspect the individuals are the actual suspects, or that the

15 actual suspects are likely to forcibly resist interrogation; and (6) the number of officers present.

16 *Id*. at 1189-90.  *Compare Gallegos*, 308 F.3d at 991-92 (in a stop lasting forty-five minutes to

17 an hour, officers reasonably drew their guns on and handcuffed an individual when they were

18 unsure if he was armed, and brought him back to the area where the crime occurred and he was

19 originally observed in order to determine whether he was the actual suspect), *with Lambert*, 98

20 F.3d at 1182-83, 1190-91 (finding warrantless arrest without probable cause where four officers

21 (with a police dog) drew their guns on, handcuffed, and placed two individuals in police cars for

22 five to twenty-five minutes, frisked them, and searched their car, despite absence of any

ORDER RE: MOTIONS FOR
SUMMARY JUDGMENT
PAGE -13

01   specific information either individual was armed, no specific similarities to the actual suspects

02   outside of race, no violent crime in the vicinity shortly before the stop, and no resistance).

03        Richardson here argues the tactics employed, including drawing his weapon, the

04   handcuffing of plaintiffs, and their placement in a prone position on the ground for ten to

05   fourteen minutes, were justified and did not convert the stop into an arrest.   In addition to the

06   factors supporting reasonable suspicion, he notes he was alone when he initiated the stop, that

07   he perceived Lawson and Franklin as having run away from him and failing to obey multiple

08   commands to stop, that he observed Franklin with his hands in his hoodie pockets and refusing

09   the order to remove them, and that Lawson refused the command to lay on the ground.

10        Notably, Richardson omits mention of the fact he also kicked Lawson to the ground.

11   Nor does he provide citation to any case law involving a similar tactic.   The details surrounding

12   the kick, including the type of kick employed, where it fell on Lawson's body, and the position

13   of Lawson's body at the time, remain in dispute.   A determination as to these facts is necessary

14   to the resolution of whether Richardson had sufficient basis to fear for his safety to warrant the

15   intrusiveness of the actions taken.[7]   Further relevant to this issue is the fact that Richardson

16   was apparently aware another officer, Schweiger, had arrived on the scene prior to the kick.

17   (Dkt. 45, Ex. 5 at 5 (Richardson stated in his deposition that Schweiger arrived "within

18   seconds[,]" was "already there as I was kicking the individual backwards[,]" and that

19   Schweiger was able to gain control of Lawson as he was falling back; he knew Schweiger had

20

21        7   The Court disagrees with defendant's contention the kick is not relevant to this motion.   As
discussed below, the Court declines to separate the different uses of force in the consideration of
22   plaintiffs' excessive force claim.   Nor does defendant in any way explain how the kick would not be
relevant to consideration of whether the tactics employed converted the stop into an arrest.

ORDER RE: MOTIONS FOR
SUMMARY JUDGMENT
PAGE -14

01    "arrived because I could hear him kind of putting the car in motion, shutting the door."))

02          In addition, and as related to the drawing of the weapon, outside of Richardson's

03    perception Franklin had his hands in his pockets and refused the command to remove them,

04    there does not appear to have been any indication either Franklin or Lawson were armed.   (*See*,

05    *e.g.*, Dkt. 23, Ex. B (CAD report reflects report of "no weapons").)   The parties also present

06    varied depictions and perceptions as to the commands issued by Richardson and the compliance

07    of plaintiffs in relation to those commands.   Finally, Lawson and Franklin were not merely

08    handcuffed while awaiting the show-up, but were placed on the ground by one or more officers,

09    maintain their faces were pushed onto the ground during that process, and they remained on the

10    ground, for some ten to fourteen minutes, with their hands cuffed behind their backs.   That

11    Richardson did not personally perform the act of handcuffing plaintiffs does not render this

12    evidence irrelevant to the issue of whether the stop was converted into an arrest.[8]

13          The Court, in sum, does not find Richardson entitled to summary judgment in relation to

14    the stop of Lawson and Franklin.   If anything, consideration of the totality of the circumstances

15    suggests the stop was converted into an arrest.   However, a determination as to whether there

16    was justification for the tactics employed and, therefore, any conversation of the stop into an

17    arrest, is complicated by the above-described disputed issues of fact.

18    _____

19          8 The cases cited by defendant in relation to the drawing of weapons and handcuffing of
      stopped individuals are distinguishable.   *See*, *e.g.*, *Allen v. City of Los Angeles*, 66 F.3d 1052, 1056-58

20    (9th Cir. 1995) (stop followed high speed chase of over eight miles, ending in a high crime area at night,
      involving a car that might have been stolen, and individual alleging unlawful arrest was intoxicated and

21    accompanied by noncompliant and combative driver); *Buffington*, 815 F.2d at 1300-01 (police action
      followed tip of informant as to planned bank robbery, suspect had known violent criminal history, was
      wearing a disguise, and was observed to make "antic movements"); *United States v. Taylor*, 716 F.2d

22    701, 705, 709 (9th Cir. 1983) (no apparent disputes of fact that individual twice refused commands to
      comply and made "furtive movements inside the truck where his hands could not be seen.").

ORDER RE: MOTIONS FOR
SUMMARY JUDGMENT
PAGE -15

01        Nor is a determination of qualified immunity in Richardson's favor appropriate.   As

02   stated above, issues of fact preclude a determination as to the justification for the tactics

03   employed.   *See Bravo v. City of Santa Maria*, 665 F.3d 1076, 1087 (9th Cir. 2011) ("Summary

04   judgment is improper where 'there is a genuine dispute as to the facts and circumstances within

05   an officer's knowledge or what the officer and claimant did or failed to do.'") (quoting *Hopkins*

06   *v. Bonvicino*, 573 F.3d 752, 763 (9th Cir. 2009)).   Taking the facts alleged by plaintiffs as true

07   supports the existence of both a constitutional violation and the conclusion a reasonable police

08   officer would have known the tactics employed exceeded the boundaries of a valid *Terry* stop.

09   *See Saucier*, 553 U.S. at 201-02.   Accordingly, a finding of qualified immunity on the issue of

10   whether the *Terry* stop was converted into an arrest is not warranted at this time.

11              c.      Unlawful arrest:

12        A plaintiff must establish a lack of probable cause in order to prevail on a § 1983

13   unlawful arrest claim.   *Norse v. City of Santa Cruz*, 629 F.3d 966, 978 (9th Cir. 2010) (citing

14   *Cabrera v. City of Huntington Park*, 159 F.3d 374, 380 (9th Cir. 1998)).   "Probable cause

15   exists when the facts and circumstances within the officer's knowledge are sufficient to cause a

16   reasonably prudent person to believe that a crime has been committed." *Lassiter v. City of*

17   *Bremerton*, 556 F.3d 1049, 1053 (9th Cir. 2009).   Stated another way, probable cause to arrest

18   exists when the officer has knowledge or reasonably trustworthy information sufficient to lead

19   a person of reasonable caution to believe an offense has been or is being committed by the

20   person being arrested.   *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) (citing

21   *Beck*, 379 U.S.at 91).   Probable cause is an objective standard.   *Id.*

22        Richardson argues probable cause to arrest plaintiffs existed following the show-up and

ORDER RE: MOTIONS FOR
SUMMARY JUDGMENT
PAGE -16

01 positive identification by Fantozzi.  Again, Fantozzi initially identified his assailants as two

02 skinny African-American males in their mid-to-late twenties, both wearing jeans and one

03 wearing a black or dark hoodie, and Richardson observed Lawson and Franklin, two young

04 black males, one of whom was wearing a dark hoodie and jeans, in the vicinity of the assault,

05 shortly after the assault occurred.  Richardson was thereafter informed that Fantozzi, not long

06 after the assault occurred, made a positive identification of Lawson and Franklin as the

07 individuals who assaulted him.  These facts and circumstances support the existence of

08 probable cause for the arrest at that time.  *See generally United States v. Bagley*, 772 F.2d 482,

09 492 (9th Cir. 1985) (relevant factors in considering reliability of identifications are: "(1) the

10 opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree

11 of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of

12 certainty demonstrated by the witness at the confrontation; and (5) the length of time between

13 the crime and the confrontation.") (citing *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972)).

14        Plaintiffs assert Officer Kelly "switched to another transmission and communicated to

15 Richardson that Fantozzi could not identify either Lawson or Franklin[,]" and that Kelly later

16 purposely failed to communicate with Lawson and Franklin in an effort to conceal the absence

17 of a positive identification.  (Dkt. 40 at 10.)  However, these contentions are unsupported by

18 any citation or reference to evidence in the record, and do not, therefore, suffice to defeat

19 summary judgment.  Fed. R. Civ. P. 56(c)(1); *Hernandez*, 343 F.3d at 1112.

20        Plaintiffs also maintain Fantozzi never gave a positive identification, pointing to his

21 second declaration and the fact he did not include information about a positive identification in

22 his written statement.  (Dkt. 50 and Dkt. 24, Ex. B.)  However, whatever Fantozzi may have

01  been trying to communicate, there is an absence of any indication he actually refuted Kelly's

02  assertion she was going to take his statements as a positive identification.  (Dkt. 24 at 3.)  (*See*

03  *also* Dkt. 45, Ex. 10 at 34:7-12 (Kelly stated in her deposition: "I don't have specifics.   I just

04  know from my report that he gave me a positive identification.  . . .   He positively identified

05  the subjects that were being detained as the subjects who had assaulted him."))

06         Nor is there any indication Richardson had any information other than that a positive

07  identification had been made.  As stated above, a determination of probable cause considers

08  the facts and circumstances "within the officer's knowledge[.]"  *Lassiter*, 556 F.3d at 1053.

09  Also, as with the existence of reasonable suspicion, plaintiffs' own expert agreed that, once

10  Richardson received information a positive identification had been made, he had probable

11  cause to arrest.   (*See* Dkt. 22, Ex. C at 76:12-77:9.)   At the least, and as Richardson argues, he

12  is entitled to qualified immunity for his reasonable reliance on the communication as to

13  identification provided by his fellow officer.  *Torres v. City of L.A.*, 548 F.3d 1197, 1212 (9th

14  Cir. 2008) (granting qualified immunity to officer who reasonably relied on information from a

15  fellow officer that the suspect had been positively identified).  The Court, for all of these

16  reasons, finds defendant entitled to summary judgment in relation to the unlawful arrest claim

17  following the show-up and positive identification by Fantozzi.[9]

18                     d.    Excessive force:

19         An excessive force claim is examined under the reasonableness standard of the Fourth

20

21  _____
        9   The Court reserves for further consideration defendant's assertion that any damages relating
    to plaintiffs' arrest and detention are severed from the point he had probable cause for the arrest.  *See*

22  *Smith v. Kelly*, C11-623-RAJ, 2013 U.S. Dist. LEXIS 153172 at *44-56 (W.D. Wash. Oct. 24, 2013).

ORDER RE: MOTIONS FOR
SUMMARY JUDGMENT
PAGE -18

01 Amendment and the framework outlined by the Supreme Court in *Graham v. Connor*, 490 U.S.

02 386 (1989).  *Davis v. City of Las Vegas*, 478 F.3d 1048, 1054 (9th Cir. 2007); *Smith v. City of*

03 *Hemet*, 394 F.3d 689, 700 (9th Cir. 2005) (en banc).  "That analysis requires balancing the

04 'nature and quality of the intrusion' on a person's liberty with the 'countervailing governmental

05 interests at stake' to determine whether the use of force was objectively reasonable under the

06 circumstances."  *Smith*, 394 F.3d at 701 (quoting *Graham*, 490 U.S. at 396).

07       The Court first assesses the quantum of force – the type and amount of force – used

08 against plaintiffs, and then considers the totality of the circumstances and factors relevant to the

09 governmental interests at issue, including, but not limited to, (1) the severity of the crime at

10 issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others,

11 and (3) whether he is actively resisting or attempting to evade arrest.  *Bryan v. MacPherson*,

12 630 F.3d 805, 824-26 (9th Cir. 2010) (citing *Graham*, 490 U.S. at 396).  Whether the force

13 used was objectively reasonable "must be judged from the perspective of a reasonable officer

14 on the scene, rather than with the 20/20 vision of hindsight."  *Graham*, 490 U.S. at 396-97

15 (citation omitted).

16       Because the excessive force inquiry "'nearly always requires a jury to sift through

17 disputed factual contentions, and to draw inferences therefrom,'" the Ninth Circuit has "'held

18 on many occasions that summary judgment or judgment as a matter of law in excessive force

19 cases should be granted sparingly.'"  *Smith*, 394 F.3d at 701 (quoting *Santos v. Gates*, 287 F.3d

20 846, 853 (9th Cir. 2002)).  "This is because such cases almost always turn on a jury's

21 credibility determinations."  *Id.*

22       Richardson clarifies he moves for summary judgment solely in relation to the pointing

ORDER RE: MOTIONS FOR
SUMMARY JUDGMENT
PAGE -19

01  of the firearm, routine handcuffing techniques, and the alleged push of Franklin's face into the

02  ground, and not in relation to the kicking of Lawson.   The Court, however, finds such parsing

03  of plaintiffs' excessive force claim inappropriate.   As reflected above, "[d]etermining whether

04  the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment

05  requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth

06  Amendment interests' against the countervailing governmental interests at stake."   *Graham*,

07  490 U.S. at 396.   While it appears Richardson may not be held responsible for pushing

08  Franklin's face into the ground (*see* Dkt. 22, Ex. A at 26:4-13), the intrusion here includes, at a

09  minimum, a kick, to Lawson's chest or face/jaw, within seconds of the drawing of Richardson's

10  firearm, in the "low ready" position or directly at plaintiffs.   The jury should be allowed the

11  opportunity to consider all of the force brought to bear against plaintiffs so that the necessary

12  balance is appropriately weighed.   *See, e.g., Hall v. County of Whatcom*, No. C09-1545-RSL,

13  2011 U.S. Dist. LEXIS 143486 at *12-13 (W.D. Wash. Dec. 13, 2011) (declining to separate

14  excessive force and state law assault claims related to alleged strikes to testicles, from use of

15  handcuffs and a "'pain hold'").   Defendant, for these reasons, is not entitled to either summary

16  judgment or qualified immunity on the excessive force claim.

17          2.      False Arrest and False Imprisonment:

18          The existence of probable cause, after the identification by Fantozzi, serves as a

19  complete defense to plaintiffs' state law false arrest and imprisonment claims.   *Hanson v. City*

20  *of Snohomish*, 121 Wn.2d 552, 563-64, 852 P.2d 295 (1993) ("[P]robable cause is a complete

21  defense to an action for false arrest and imprisonment."); *McBride v. Walla Walla Cnty.*, 95

22  Wn. App. 33, 38, 975 P.2d 1029 (1999) (same).   Defendant is, accordingly, entitled to

ORDER RE: MOTIONS FOR
SUMMARY JUDGMENT
PAGE -20

01  summary judgment in relation to such claims.   However, as neither party addresses the

02  existence or viability of false arrest or imprisonment claims relating to the period prior to

03  Fantozzi's identification, the Court declines to render a ruling associated with any such claims.

04          3.    Assault and Battery:

05          Defendant argues that, because the force was reasonable, plaintiffs' state law assault

06  and battery claims must also be dismissed.   *See Boyles v. Kennewick*, 62 Wn. App. 174, 176,

07  813 P.2d 178 (1991) ("Generally, a police officer making an arrest is justified in using

08  sufficient force to subdue a prisoner, however he becomes a tortfeasor and is liable as such *for*

09  *assault and battery* if unnecessary violence or excessive force is used in accomplishing the

10  arrest.") (emphasis in original).   However, as with the excessive force claim, the Court finds a

11  ruling on plaintiffs' assault and battery claims precluded by disputes of fact.

12          4.    Intentional Infliction of Emotional Distress:

13          To prove a claim for intentional infliction of emotional distress (or outrage) under

14  Washington law, plaintiffs must show:   (1) extreme and outrageous conduct; (2) intentional or

15  reckless infliction of emotional distress; and (3) actual result of severe emotional distress.

16  *Kloepfel v. Bokor*, 149 Wn.2d 192, 195-96, 66 P.3d 630 (2003).   The claim must be predicated

17  on behavior "so outrageous in character, and so extreme in degree, as to go beyond all possible

18  bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized

19  community." *Id*. at 196 (quoted sources, quotation marks, and emphasis omitted).   "[M]ere

20  insults, indignities, threats, annoyances, petty oppressions, or other trivialities" do not rise to

21  the requisite level of offending behavior.   *Id*.   While the question of whether conduct is

22  sufficiently outrageous is ordinarily for a jury, the Court initially determines whether

ORDER RE: MOTIONS FOR
SUMMARY JUDGMENT
PAGE -21

01 reasonable minds could differ on whether conduct has been sufficiently extreme and outrageous

02 to result in liability.  *Phillips v. Hardwick*, 29 Wn. App. 382, 387, 628 P.2d 506 (1981).

03         Defendant observes and plaintiffs do not dispute that, to the extent plaintiffs' allegations

04 of mental distress stem from their allegations of assault and battery and false arrest/

05 imprisonment, they are subsumed and may not be brought as an independent claim of outrage.

06 *See Rice v. Janovich*, 109 Wn.2d 48, 61-62, 742 P.2d 1230 (1987) (finding error in jury

07 instruction allowing for "possibility of double recovery" on both assault and tort of outrage for

08 same conduct).   Plaintiffs point to the remaining conduct, including the mockery of Lawson's

09 name, Richardson's comments regarding Franklin's hairstyle and how he would "make stuff

10 up," and the statements regarding Franklin's credit cards as sufficient to support an independent

11 claim of intentional infliction of emotional distress.

12         Plaintiffs fail to explain how the credit card comments, admittedly made outside of

13 Franklin's presence (*see* Dkt. 22 at 4:24-6:5), could be construed as an intentional or reckless

14 infliction of emotional distress.   Moreover, even assuming all facts alleged by plaintiffs as true

15 and drawing all reasonable inferences in their favor, the behavior at issue cannot be said to have

16 been so outrageous and extreme "as to go beyond all possible bounds of decency, and to be

17 regarded as atrocious, and utterly intolerable in a civilized community."   *Kloepfel*, 149 Wn.2d

18 at 196.   "The law intervenes only where the distress inflicted is so severe that no reasonable

19 person could be expected to endure it."   *Saldivar v. Momah*, 145 Wn. App. 365, 390, 186 P.3d

20 1117 (2008).   Here, while clearly unprofessional and objectionable, Richardson's comments

21 and behavior are appropriately described as "insults, indignities, threats, annoyances, petty

22 oppressions, or other trivialities[]" not rising to the level of offending behavior required for a

ORDER RE: MOTIONS FOR
SUMMARY JUDGMENT
PAGE -22

01   claim of outrage.  *Kloepfel*, 149 Wn.2d at 196.  *Cf. id.* at 194 (conduct supporting outrage

02   claim included, *inter alia*, violations of no contact orders resulting in multiple convictions,

03   threats to plaintiff's life and to the life of man she was dating, 640 and 100 phone calls to

04   plaintiff's home and work respectively, driving by her house at all hours, and resulting in

05   plaintiff's need to spend weekends away from home and for her employer to make

06   arrangements to protect her at work).  Defendant is, as such, entitled to summary judgment on

07   the claim of intentional infliction of emotional distress (outrage).[10]

08            5.    Negligent Infliction of Emotional Distress and Negligence:

09            Plaintiffs also assert claims of both negligent infliction of emotional distress and

10   negligence.  In either case, a cause of action exists "only if 'the defendant owes a duty of care

11   to plaintiff.'"  *Osborn v. Mason Cnty.*, 157 Wn.2d 18, 27, 134 P.3d 197 (2006) (quoting

12   *Chambers-Castanes v. King Cnty.*, 100 Wn.2d 275, 284, 669 P.2d 451 (1983)); *see also Strong

13   v. Terrell*, 147 Wn. App. 376, 387, 195 P.3d 977 (2008) (plaintiff may recover for negligent

14   infliction of emotional distress upon proving "negligence, that is, duty, breach of the standard

15   of care, proximate cause, and damage," and "the additional requirement of objective

16   symptomatology.")

17            "As a general rule, law enforcement activities are not reachable in negligence."  *Keates

18   v. City of Vancouver*, 73 Wn. App. 257, 267, 869 P.2d 88 (1994).  Under the public duty

19   doctrine, "[w]hen the defendant is a public official . . . no liability will attach for a public

20   official's negligent conduct unless the plaintiff can show that the duty was owed to [him] rather

21   ───────────────────

22            10  Finding the conduct alleged insufficient to constitute intentional infliction of emotional
     distress, the Court does not address the parties' arguments regarding evidence plaintiffs suffered actual
     emotional distress relating to the events at issue in this matter.

ORDER RE: MOTIONS FOR
SUMMARY JUDGMENT
PAGE -23

01   than to the general public." *Donaldson v. City of Seattle*, 65 Wn. App. 661, 666, 831 P.2d

02   1098 (1992) (citing *Taylor v. Stevens Cnty.*, 111 Wn.2d 159, 759 P.2d 447, 449-50 (1988)).

03   *See also Hernandez v. Kunkle*, C12-178-RSM, 2013 U.S. Dist. LEXIS 6701 at *25 (W.D.

04   Wash. Jan. 15, 2013) ("Courts recognize four exceptions to the public duty doctrine: (1)

05   legislative intent, (2) failure to enforce when there is actual knowledge of a statutory violation,

06   (3) failure to exercise reasonable care when coming to the aid of a particular plaintiff, and (4)

07   where the injured plaintiff has a special relationship entailing a separate duty from that owed

08   the general public.") (cited source omitted).

09        As Richardson observes, plaintiffs may not base claims of negligence on alleged

10   intentional actions, such as excessive force or unlawful arrest. *Willard v. City of Everett*,

11   C12-14-TSZ, 2013 U.S. Dist. LEXIS 126409 at *5 (W.D. Wash. Sep. 4, 2013).  Moreover,

12   plaintiffs' negligence claims are barred by the public duty doctrine given their failure to identify

13   any duty owed to them, or exception to that doctrine.   While plaintiffs suggest the Court look

14   to some "alternate duty of reasonable care" (Dkt. 40 at 23-24), they fail to identify any such

15   duty recognized under the law or applicable to this case.  *See, e.g.*, *Rengo v. Cobane*,

16   C12-298-TSZ, 2013 U.S. Dist. LEXIS 91613 at *14-15 (W.D. Wash. Jun. 28, 2013) ("Police

17   officers owe no duty to use reasonable care to avoid inadvertent infliction of emotional distress

18   on the subjects of criminal investigation.") (citing *Keates*, 73 Wn. App. at 267); *James v. City of*

19   *Seattle*, C10-1612-JLR, 2011 U.S. Dist. LEXIS 142680 at *54-55 (W.D. Wash. Dec. 12, 2011)

20   ("[W]hile it is true that the officers 'owe[] a general duty to all [] citizens [of the City] to avoid

21   the use of excessive force when effectuating an arrest, it cannot be said that they owe [the

22   plaintiff] a specific duty.'") (quoted sources omitted).  Defendant is entitled to summary

ORDER RE: MOTIONS FOR
SUMMARY JUDGMENT
PAGE -24

01  judgment on plaintiffs' negligent infliction of emotional distress and negligence claims.[11]

02  D.    City of Seattle's Motion for Summary Judgment

03      Plaintiffs also seek to hold the City of Seattle liable under § 1983 and in relation to their

04  state law claims.   In response to defendant City of Seattle's motion for summary judgment,

05  plaintiffs provide clarification as to the nature of their municipal liability claim under § 1983 –

06  addressing only the issue of excessive force and contending a violation of their constitutional

07  rights through a policy or custom of "authorizing Seattle Police Officers to use excessive force

08  against citizens without justification."   (Dkt. 39 at 1-2.)   The Court, as such, limits its

09  consideration of municipal liability under § 1983 to the claim as clarified by plaintiffs.[12]

10      1.    Municipal Liability Under § 1983:

11      A local government unit or municipality can be sued as a "person" under § 1983.

12  *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691-94 (1978).   However, a municipality may

---

13    11 Plaintiffs moved to strike the opinions of defense expert Grant Fredericks and a statement
14  contained within defense expert Jeffrey Noble's declaration.   (Dkt. 40 at 24.)   However, having found
    no need to utilize that evidence in considering the pending motions, the Court declines to address the
    motion to strike.

15
16    12 The Court further finds plaintiffs to have abandoned any federal or state municipal liability
    claims associated with a failure to train, ratification of an unconstitutional act, and/or negligent
17  supervision, and defendant entitled to summary judgment in relation to any such claims.   *See, e.g.*,
    *Penigar v. County of San Bernardino*, No. 12-55857, 2014 U.S. App. LEXIS 4573 at *2 (9th Cir. Mar.
    11, 2014) (upholding summary judgment where County submitted evidence its training and supervision
18  policies were reasonable, and claimant did not offer any evidence to the contrary); *Marsh v. City of San
    Diego*, 680 F.3d 1148, 1159 (9th Cir. 2010) (affirming dismissal of failure to train claim where plaintiff
    provided no evidence training was inadequate or that additional training was necessary); *Sheehan v. City
19  & County of San Francisco*, 743 F.3d 1211, __, 2014 U.S. App. LEXIS 3321 at *50-51 (9th Cir. 2014)
    (ratification requires a showing the "'authorized policymakers approve a subordinate's decision and the
20  basis for it.'"; ratification theory failed where there was no evidence city "'made a deliberate choice to
    endorse' the officers' actions[,]" and mere failure to discipline does not amount to ratification); *Shope v.
21  City of Lynnwood*, C10-256-RSL, 2011 U.S. Dist. LEXIS 32069 at *19-20 (W.D. Wash. Mar. 28, 2011)
    (plaintiff's negligent training, supervision, hiring, and retention claim against municipality barred by
22  public duty doctrine:   "The duty of the City to hire, train, retain, and supervise its officers is owed to the
    public at large, not to plaintiff individually.")

01     only be held liable for an official's unconstitutional conduct under § 1983 if such conduct was

02     caused by a city policy or custom.   *Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir.

03     2005) (citing *Monell*, 436 U.S. at 691-94).   A municipality cannot be held liable solely because

04     it employs a tortfeasor, under a *respondeat superior* theory.   *Monell*, 436 U.S. at 691.

05         Plaintiffs must show the identified policies or customs were the "moving force" behind

06     the constitutional violation.   *See id.* at 694-95.   That is, plaintiffs must demonstrate "a direct

07     causal link between a municipal policy or custom and the alleged constitutional deprivation."

08     *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).

09         Plaintiffs here maintain the violations of their constitutional rights occurred as a result

10     of the City of Seattle's longstanding custom of authorizing, exonerating, and not reprimanding

11     officers who use excessive force, and that this custom proximately caused their injuries.   In

12     support of this contention, plaintiffs rely in large part on a 2011 report from the United States

13     Department of Justice (DOJ) finding the Seattle Police Department (SPD) engages in a pattern

14     or practice of using unnecessary or excessive force (Dkt. 49, Ex. 9), and a report and

15     supplemental report from plaintiffs' expert (Dkts. 53 and 55).   Plaintiffs' expert opines, with

16     no supporting analysis or explanation, that only one out of 1,216 SPD "use of force" files he

17     reviewed was recommended for further review; that his review "documents a per se 'rubber

18     stamping' by the SPD chain of command that any and all uses of force inflicted by their officers

19     will be 'Within policy.'"; that the "DOJ is correct in their conclusion that the SPD has a custom

20     and practice of inflicting excessive force on citizens within their jurisdiction."; and that "there

21     were indications of egregious acts by SPD officers that were not further reviewed but were

22     found to be 'within policy.'"   (Dkt. 53 at 11-12; Dkt. 55, Ex. A.)

ORDER RE: MOTIONS FOR
SUMMARY JUDGMENT
PAGE -26

01          Defendant moves to strike the portions of the expert reports addressing municipal

02   liability as both not timely disclosed and lacking in reliability.  (Dkt. 62 at 2-7.)  The Court

03   finds these arguments compelling.  However, it remains that, even considering this evidence

04   for the purpose of evaluating the motion for summary judgment, plaintiffs fail to demonstrate

05   municipal liability under *Monell*.

06          As defendant observes, and as previously found by this Court:  "It is not enough to

07   point to a policy and posit a connection between it and a constitutional violation.  To do so

08   would render *Monell* a 'dead letter.'"  *Caylor v. City of Seattle*, C11-1217-RAJ, 2013 U.S.

09   Dist. LEXIS 62486 at *50 (W.D. Wash. Apr. 30, 2013) (citing *Oklahoma City v. Tuttle*, 471

10   U.S. 808, 823 (1985) ("Obviously, if one retreats far enough from a constitutional violation

11   some municipal 'policy' can be identified behind almost any . . . harm inflicted by a municipal

12   official; for example [the defendant officer] would never have killed [the suspect] if [the city]

13   did not have a 'policy' of establishing a police force.").)  Plaintiffs here, in light of the mere

14   existence of the DOJ report and its findings and through the generalized and conclusory

15   opinions in their expert report, fail to demonstrate the requisite causation between a municipal

16   policy and the conduct at issue in this case.  There is, in other words, no evidence supporting

17   the conclusion that a policy or custom of authorizing and/or not punishing the use of excessive

18   force as a general matter caused Richardson to draw his gun and kick Larson, as opposed to

19   Richardson's perception – whether or not reasonable – that plaintiffs posed a risk to his safety.

20   *See id.* at *47-48 (rejecting *Monell* claim based on alleged policies of, *inter alia*, "training

21   skewed toward the use of force and away from de-escalation skills," rubber stamping unlawful

22   shootings, and a "use-of-force policy authorize[ing] the use of deadly force without an

01   imminent deadly threat[,]" where there was no evidence such policies caused the officer

02   defendant to shoot the plaintiff).

03        Plaintiffs also fail to support *Monell* liability through evidence of the SPD's failure to

04   discipline Richardson in relation to this and one other, unrelated use of force incident.   (*See*

05   Dkt. 49, Ex. 6 (March 2005 use of force statement by Richardson).)   While a municipal policy

06   "may be inferred from widespread practices or 'evidence of repeated constitutional violations

07   for which the errant municipal officers were not discharged or reprimanded,' [a] plaintiff

08   cannot prove the existence of a *municipal* policy or custom based solely on the occurrence of a

09   single incident or unconstitutional action by a non-policymaking employee." *Nadell v. Las*

10   *Vegas Metro. Police Dep't*, 268 F.3d 924, 929 (9th Cir. 2001) (emphasis in original) (quoted

11   and cited sources omitted).   Indeed, and as also found by this Court, "two isolated examples"

12   of officers acting pursuant to an alleged policy "are insufficient as a matter of law to

13   demonstrate a longstanding policy or custom that is the 'standard operating procedure' of the

14   municipality[,]" and "[t]o permit such an inference to suffice would eviscerate the most basic

15   requirement of a *Monell* claim." *Morales v. Fry*, C12-2235-JCC, 2014 U.S. Dist. LEXIS

16   40344 at *44-45 & n.12 (W.D. Wash. Mar. 25, 2014) (citing *Marsh*, 680 F.3d at 1159 (single

17   instance of violation insufficient to constitute a 'widespread practice' that would provide notice

18   to county that additional training was necessary); *Menotti*, 409 F.3d at 1151 (plaintiff provided

19   evidence of only two allegedly unlawful searches, which were insufficient to demonstrate a

20   "longstanding practice or custom [that] constitutes the 'standard operating procedure' of the

21   local government entity"); *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) ("Liability for

22   improper custom may not be predicated on isolated or sporadic incidents; it must be founded

ORDER RE: MOTIONS FOR
SUMMARY JUDGMENT
PAGE -28

01    upon practices of sufficient duration, frequency and consistency that the conduct has become a

02    traditional method of carrying out policy."))

03         Plaintiffs, in sum, fail to provide evidence supporting a causal link between any alleged

04    policy or custom on the part of the SPD and defendant Richardson's use of force in this case.

05    The Court, for this reason, finds defendant City of Seattle entitled to summary judgment on the

06    issue of *Monell* liability.

07         2.     <u>Municipal Liability in Relation to State Law Claims</u>:

08         As discussed above, while finding other state law claims subject to dismissal, the Court

09    finds summary judgment on plaintiffs' assault and battery claims precluded by disputed issues

10    of fact, and an absence of argument allowing for a determination as to any state law false arrest

11    or imprisonment claims relating to the period prior to the witness identification.   It appears

12    plaintiffs also seek to hold the City of Seattle liable for state law claims of assault and battery

13    and false arrest and/or imprisonment under a theory of *respondeat superior*.   (*See* Dkt. 71 at 2.)

14    Finding no argument specific to the remaining or possibly remaining state law claims under the

15    proposed theory, the Court declines to reach a determination as to municipal liability in relation

16    to any such claims.

17                   <u>CONCLUSION</u>

18         Defendant City of Seattle's motion for summary judgment (Dkt. 19) and defendant

19    Richardson's motion for partial summary judgment (Dkt. 21) are GRANTED in part and

20    DENIED in part.   Specifically, summary judgment is granted as to municipal liability under §

21    1983, in relation to reasonable suspicion for the stop, unlawful arrest following the witness

22    identification, and state law claims of false arrest and imprisonment following the witness

ORDER RE: MOTIONS FOR
SUMMARY JUDGMENT
PAGE -29

01  identification, intentional and negligent infliction of emotional distress, and negligence.   All

02  remaining claims as discussed herein will proceed to trial.

03          DATED this 21st day of April, 2014.

04

05                                        _____
                                          Mary Alice Theiler
06                                        Chief United States Magistrate Judge

07

08

09

10

11

12

13

14

15

16

17

18

19

20

21

22

ORDER RE: MOTIONS FOR
SUMMARY JUDGMENT
PAGE -30